# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 22, 2025

A. Thompson Bayliss, Esquire
April M. Ferraro, Esquire
E. Wade Houston, Esquire
Michael T. Manuel, Esquire
Daniel J. McBride, Esquire
Ben Lucy, Esquire
Clara Hubbard, Esquire
Abrams & Bayliss LLP
20 Montchanin Road
Wilmington, Delaware 19807

Jonathan M. Kass, Esquire
Alexander J. Rigby, Esquire
Reid Collins & Tsai LLP
300 Delaware Avenue, Suite 700
Wilmington, Delaware 19801

Samuel T. Hirzel, II, Esquire
Brendan Patrick McDonnell, Esquire
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue, Suite 200
Wilmington, Delaware 19801

> RE: *In re Appraisal of Endeavor Group Holdings, Inc.*,
> C.A. No. 2025-0317-LWW

Dear Counsel:

On March 24, 2025, private equity firm Silver Lake acquired Endeavor Group Holdings, Inc., taking the company private at $27.50 per share. Numerous Endeavor stockholders dissented from the merger to demand appraisal.

A flurry of appraisal petitions in this court followed—each asserting that the fair value of Endeavor's stock exceeded the deal price. Because the appraisal statute contemplates a single proceeding, the petitions were consolidated. The designation of petitioners' counsel to lead this suit remained unresolved.

Two sets of lead counsel contenders emerged. The first set, who originally represented most of the petitioners, touted their clients' large interests and the incentive alignment fostered by their contingency fee structure. The second set, with a smaller yet sizeable client group, criticized the client acquisition tactics and financial motives of the competing lawyers.

The leadership dispute grew heated. Tensions boiled over. And the tides shifted.

Several dissenting stockholders ended their engagements with the first set of lawyers and hired the second set, who now represents most dissenting stockholders. That fact alone is not determinative. Both sets of lawyers are highly skilled and qualified. On balance, though, the overwhelming economic stake represented by the second set of lawyers and potential conflicts sparked by the first set's fee structure tip the scales. I appoint the second set lead counsel.

## I.   RELEVANT FACTS

On March 24, 2025, Silver Lake completed its acquisition of the Endeavor shares it did not already own for $27.50 per share—a roughly $13 billion equity value.[1]   The price represented a 55% premium to the unaffected stock price.[2] Endeavor's largest asset was a controlling stake in another public company—TKO Group Holdings, Inc.—whose stock soared between the deal's signing and closing. Endeavor stockholders holding about 150 million shares worth a combined $4.1 billion at the deal price dissented from the merger, invoking their statutory appraisal rights.[3]

On March 25, the first appraisal petition was filed in this court.[4]   Two dozen more followed.  On April 29, I consolidated the appraisal petitions.[5]  A dispute over leadership emerged among petitioners' counsel, prompting motions practice.

---

[1]  Silver Lake, *Silver Lake to Take Endeavor Private* (April 2, 2024), https://www.silverlake.com/silver-lake-to-take-endeavor-private.

[2] This is based on the $17.72 per share price at market close on October 25, 2023—the last full trading day before Endeavor announced a review of strategic alternatives.  *See id.*

[3] *See* 8 *Del. C.* § 262.  To be precise, there are 149,250,809 dissenting shares worth $4,104,397,247.50 at the deal price.  *See* A&B Group's Revised Br. in Opp'n to RKS Group's Mot. for Designation as Sole Lead Counsel and in Supp. of Cross-Mot. for Alternative Leadership Structure (Dkt. 71) ("A&B Group Opening Br.").

[4] *See* 8 *Del. C.* § 262.

[5] Dkt. 12.

First, Rolnick Kramer Sadighi LLP ("RKS") and Heyman Enerio Gattuso & Hirzel LLP (with RKS, the "RKS Group") moved to be appointed sole lead counsel.[6] At the time of their motion, the RKS Group represented stockholders holding more than 90 million of the 150 million shares that dissented from the merger.[7] The RKS Group argued that since an appraisal action is singularly focused on the fair value of stock at closing, "[t]he petitioners with the greatest financial interest in the outcome of that determination are in the best position to litigate the petition."[8] It rebuffed the notion of a shared leadership role.[9]

A few weeks later, Abrams & Bayliss LLP ("A&B") and Reid Collins & Tsai LLP ("RCT"; with A&B, the "A&B Group") opposed the RKS Group's motion.[10]

---

[6] Mot. for Designation as Sole Lead Counsel (Dkt. 13) ("RKS Group Opening Br.").

[7] *Id.* at 5.

[8] *Id.* at 4.

[9] *See infra* notes 37-39 and accompanying text (detailing the RKS Group's arguments against appointing co-lead counsel).

[10] *See* A&B Group's Brief in Opp'n to RKS Group's Mot. for Designation as Sole Lead Counsel and in Supp. of Cross-Mot. for an Alternative Leadership Structure (Dkt 16); RCT Br. in Opp'n to RKS Motion for Designation as Sole Lead Counsel and Alternative Form of Order (Dkt. 14) ("RCT Opening Br."). A&B's original brief inappropriately characterized the RKS Group's actions as verging on criminal, which prompted the RKS Group to move to strike it. Dkt. 26. At oral argument, I held in abeyance a ruling on the motion to strike and asked A&B to refile a brief that comported with the civility obligations of lawyers practicing in this court. Tr. of July 15, 2025 Oral Arg. (Dkt. 73) ("Hr'g Tr.") 10-11. A&B did so on July 16, mooting the motion to strike.

The A&B Group cross-moved for A&B to be lead counsel, with RCT as additional counsel.[11]  At that point, the A&B Group represented dissenting stockholders with over 56 million shares.[12]

Several large dissenters then terminated their engagements with RKS to hire A&B.  The RKS Group's client base shrunk to a still substantial 30 million shares— about a third of what it previously represented.[13]  The A&B Group's representation rose to over 110 million shares.[14]

Oral argument on the leadership motions took place on July 15.[15]  The RKS Group pivoted to seeking a co-leadership role with A&B.[16]  The A&B Group

---

[11] A&B Group Opening Br. 54; RCT Opening Br. 8.

[12] A&B Group Opening Br. 4-5.  With the additional dissenters who hired RCT, the A&B Group collectively represented about 40% of total dissenters at the time the motions were filed.  *See* RCT Opening Br. 9.

[13] *Compare* Ltr. Regarding Pre-Arg. Status Update (Dkt. 63) ("RKS Group July 14 Status Update"), *with supra* note 7 and accompanying text.

[14] *Compare* Ltr. Regarding Hr'g Scheduled for July 15, 2025 (Dkt. 64) ("A&B July 14 Ltr."), *with supra* note 12 and accompanying text.  Two other large stockholders represented by other Delaware counsel expressed support for A&B's appointment.  *See* Dkt. 62.

[15] *See* Dkt. 74.

[16] *See* RKS Group July 14 Status Update 1; Hr'g Tr. 14.

rejected that arrangement.[17]   Afterward, several more dissenters terminated engagements with the RKS Group to retain A&B.[18]

## II.   ANALYSIS

Appraisal actions are "in the nature of a class [action] suit" and share some similarities.[19]  In either context, the court has the discretion to appoint lead counsel to represent a diverse body of stockholders.[20]  But appraisal suits are not class actions; there is no class for the court to certify.[21]  Dissenting stockholders must comply "with the statutory formalities required to perfect their appraisal rights."[22]

Court of Chancery Rule 23, which governs class actions, does not apply to appraisal proceedings.[23]  Still, Rule 23 and caselaw in the class action context

---

[17] *See* Hr'g Tr. 61-64; A&B July 14 Ltr. 2.

[18] Corrected Ltr. Regarding Update Following July 15, 2025 Oral Arg. (Dkt. 73) ("A&B July 19 Ltr.").

[19] *Alabama By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 260 (Del. 1995) (citing *S. Prod. Co., Inc. v. Sabath*, 87 A.2d 128, 134 (Del. 1952)); *see also Sunrise P'rs Ltd. P'ship v. Rouse Props., Inc.*, 2016 WL 7188104, at *4-5 (Del. Ch. Dec. 8, 2016) (listing three examples of similarities between appraisal and class actions).

[20] *Rouse*, 2016 WL 7188104, at *8.

[21] *See id.* at *4 (explaining that "as a matter of substantive law that this Court will not certify a class of dissenting stockholders who seek statutory appraisal").

[22] *Alabama By-Prods.*, 657 A.2d at 260 n.10; *see* 8 *Del. C.* § 262(d).

[23] Ct. Ch. R. 23 (outlining the procedures and requirements for bringing and maintaining class action lawsuit).

provide guidance on resolving lead counsel applications in an appraisal.[24]  I begin

by summarizing the relevant law and go on to apply it to the present facts by analogy.

### A.     The *Hirt* Factors and Rule 23(a)

Delaware courts traditionally considered the *Hirt* factors when appointing

lead counsel in a representative action.[25]  In May 2024, the Court of Chancery

amended Rule 23 to codify eight factors the court may consider in resolving class

leadership disputes:

> (i) counsel's competence and experience; (ii) counsel's access to
> the resources necessary to represent the class; (iii) the quality of
> the pleading; (iv) counsel's performance in the litigation to date;
> (v) the proposed leadership structure; (vi) the relative economic
> stakes of the representative parties; (vii) any conflicts between
> counsel or the representative parties and members of the class;
> and (viii) any other matter pertinent to the ability of counsel or
> the representative party to fairly and adequately represent the
> interests of the class.[26]

---

[24] *See Rouse*, 2016 WL 7188104, at *6 ("[I]t is appropriate to look for guidance to this Court's practices regarding the management of class action litigation.").

[25] *Hirt v. U.S. Timberlands Serv. Co.*, 2002 WL 1558342 (Del. Ch. July 3, 2002); *see Rouse*, 2016 WL 7188104, at *6 (applying the *Hirt* factors before appointing lead counsel in an appraisal action).  The *Hirt* factors are: (1) "the quality of the pleading[s]"; (2) "the relative economic stakes of the competing litigants"; (3) "the willingness and ability" of counsel to "litigate vigorously on behalf of" those represented; (4) "the absence of any conflict between larger" and "smaller stockholders"; (5) counsel's "enthusiasm or vigor" in litigating the case; and (6) counsel's "competence" and "access to the resources necessary to prosecute the claims at issue." *Hirt*, 2002 WL 1558342, at *2.

[26] Ct. Ch. R. 23(d)(4)(A).  Rule 23(d)(4)(A) largely tracks *Hirt* but add as factors "the proposed leadership structure" and a catch-all letting the court consider "any other matter pertinent to the ability of counsel or the representative party to fairly and adequately

Like the *Hirt* factors, Rule 23(d) is not a "scorecard" for the court to "check[] the boxes" and "crown a 'winner'" with "the most 'points.'"[27] It merely supplies "guideposts" toward the court's "overriding goal" of "establish[ing] a leadership structure that will provide effective representation . . . ."[28] "[E]ach factor is given weight only to the extent that it bears on the ultimate question of what is in the best interests of the plaintiff class."[29]

## B.   Application of the Rule 23 Factors

The first four Rule 23(d) factors are either inapplicable or neutral in the present case. Counsel in the RKS Group and A&B Group are all highly competent

---

represent the interests of the class." Ct. Ch. R. 23(d)(4)(A)(v), (viii). Rule 23 also reformulated certain *Hirt* factors. Rather than "the absence of any conflict between larger, often institutional, stockholders and smaller stockholders," Rule 23 directs the court to note "any conflicts between counsel or the representative parties and members of the class." *Compare* Ct. Ch. R. 23(d)(4)(A)(vii), *with Hirt*, 2002 WL 1558342, at *2. And instead of "the willingness and ability of all the contestants to litigate vigorously on behalf of an entire class of shareholders" and "the enthusiasm or vigor with which the various contestants have prosecuted the lawsuit," Rule 23 contemplates an assessment of "counsel's performance in the litigation to date." *Compare* Ct. Ch. R. 23(d)(4)(A)(iv), *with Hirt*, 2002 WL 1558342, at *2.

[27] *In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012).

[28] *Id.* (quoting *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *6 (Del. Ch. Dec. 31, 2010)).

[29] *Id.*

and experienced in appraisal proceedings.[30]  Both groups have access to resources.[31]

The quality of the pleadings is irrelevant since appraisal petitions are formulaic and

the court independently determines fair value.[32]  And counsel has performed with

similar skill and vigor (even overzealousness) at this early stage.[33]

The fifth through eighth factors warrant closer consideration.  One—the

proposed leadership structures—supplies no clear answer.  The other three, however,

favor the A&B Group.

### 1. Proposed Leadership Structure

Comparable leadership structures were initially proposed by each faction.

The RKS Group asked that I appoint a New-York-based firm and a Delaware firm

as "sole lead" counsel.[34]  The A&B Group asked that I appoint a Delaware firm as

lead counsel and give a New-York based firm with a Delaware office a supporting

role.[35]

---

[30] *See* Ct. Ch. R. 23(d)(4)(A)(i).

[31] *See* Ct. Ch. R. 23(d)(4)(A)(ii).

[32] *See* Ct. Ch. R. 23(d)(4)(A)(iii); *see also Rouse*, 2016 WL 7188104, at *7 ("[T]he quality of the pleadings is not a factor that weighs in favor of either counsel.  Given that this is an appraisal action, the pleadings are relatively simple and fairly standardized.").

[33] *See* Ct. Ch. R. 23(d)(4)(A)(iv); *see also supra* note 10.

[34] RKS Group Opening Br. 1.

[35] A&B Group Opening Br. 22.

Now, the RKS Group insists that a co-lead role by which it and the A&B Group share responsibilities is warranted.[36]  In ideal circumstances, I would agree. Both groups—even as they currently stand—represent investors with significant stakes in this lawsuit's outcome.  Those investors chose to engage specific counsel.

But the facts here suggest that compelled cooperation risks dysfunction.  As the RKS Group repeatedly emphasized in its filings, sharing leadership with the A&B Group would prompt "deadlock, disorganization, inefficiency, and disagreement."[37]  The heated—even ad hominem—attacks between counsel suggest

---

[36] Hr'g Tr. 14; July 14 RKS Group Status Update 1 (providing that it would be "willing to enter into a co-counsel leadership structure").

[37] RKS Group Opening Br. 4; *see also id.* at 6 (contending that co-leadership is "likely to be outright counterproductive"); *id.* ("Imposing unnecessary co-lead petitioners and their co-lead counsel will only cause inefficiency, unnecessary duplication of effort, needless disputation and potential delays in the speedy and efficient prosecution of this single-issue action."); *id.* at 22 (asserting that "there is no benefit to adding additional lead petitioners or counsel" and that to do so would "needlessly complicate the effective and efficient prosecution of the proceedings"); *id.* at 24 ("This court should seek to promote the just, speedy and efficient resolution of this proceeding, and 'it is not in the best interests of [Endeavor] or its stockholders to appoint all of the law firms competing for leadership as co-lead counsel.'  There is no need to 'forc[e] cooperation [where doing so] risks impairing team dynamics' and 'potential dysfunction.'" (citation omitted)).

that these are valid fears.[38]  As the RKS Group put it, "[t]here should only be one captain to steer this ship."[39]  On that advice, I decline to appoint co-lead counsel.

### 2.   Relative Economic Stakes

*Hirt* counsels that "the relative economic stakes of the competing litigants in the outcome of the lawsuit" are "to be accorded 'great weight.'"[40]  But this factor is not determinative.  It is prioritized if there is a "substantial relative difference" between the factions' financial interests.[41]

Both the RKS Group and the A&B Group represent investors with "large economic stakes that would incentivize them to participate actively in the litigation."[42]  Yet there are meaningful differences in scale.  At first, the RKS Group had a much larger interest, representing 90 million of the 150 million shares eligible for appraisal.[43]  The tables have turned.  The A&B Group now represents former

---

[38] *See supra* note 10; *see also* Hr'g Tr. 10 (the court observing that both sides' behavior "crosse[d] the line").

[39] RKS Group Opening Br. 4.

[40] *Hirt*, 2002 WL 158342, at *2.

[41] *Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005); *see Delphi*, 2012 WL 424886, at *3 (finding this factor "immaterial" where the investor groups "each own[ed] a relatively small stake").

[42] *Rouse*, 2016 WL 7188104, at *7.  *Rouse* afforded this factor "great weight" because one group beneficially owned "over 75% of the shares entitled to appraisal."  *Id.*

[43] RKS Group Opening Br. 9; *see supra* note 7 and accompanying text.

stockholders with over 115 million shares versus the RKS Group's approximately 25 million shares.[44]

### 3.      Potential Conflicts and Other Matters

The final factors concern conflicts between counsel and the represented parties, and "other matters" the court finds "pertinent" to counsel's ability "to fairly and adequately represent" the litigants' interests.[45] Here, those factors are linked. The competing groups' fee structures are an important consideration in assessing counsels' incentives, and the RKS Group's structure invites discord.

A suitable fee structure bears on whether counsel can provide fair representation. Thus, Delaware courts scrutinize fee arrangements between potential lead counsel and their clients in stockholder class actions.[46] One purpose

---

[44] A&B July 19 Ltr. 1.

[45] Ct. Ch. R. 23(d)(4)(A)(vii)-(viii).

[46] *See* Ct. Ch. R. 23(d)(4)(B)(i) (permitting the court to order that a lead counsel applicant "provide information on any subject pertinent to the application and to propose terms for attorneys fees and expenses"). The advisory committee notes to analogous Federal Rule of Civil Procedure 23 explain that "the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel." Fed. R. Civ. P. 23; *see also* 1 Newberg and Rubenstein on Class Actions § 3:86 (6th ed.) ("In recognition of the substantial effect attorney's fees may have on the motivations and actions of class counsel, the rule specifically authorizes courts to order applicants to disclose information about fee agreements they have negotiated . . . .").

of that inquiry is to avoid conflicts among the lawyers' clients and other members of the putative class.[47] Because lead counsel in an appraisal suit similarly take on fiduciary responsibilities to all stockholders who perfected appraisal rights,[48] an examination of the applicants' fees is called for.

Here, the two contenders have dissimilar fee arrangements. The RKS Group offers a contingent fee structure.[49] The A&B Group is paid hourly—though investors have the option to hire RCT on a contingency basis.[50]

There are often strong arguments in favor of a contingent fee structure, which can appropriately shift financial risks of litigation onto counsel and align their interest in a maximum recovery with the stockholders they represent.[51] But the RKS Group's arrangement merits a deviation from this general wisdom. It invites

---

[47] *Cf.* Ct. Ch. R. 23(aa)(2) (requiring class representatives to affirm that they have not received or been promised compensation directly or indirectly, with specific exceptions).

[48] *See Rouse*, 2016 WL 7188104, at *5 (citing *Ala. By-Prods.*, 657 A.2d at 260).

[49] Reply Br. in Further Supp. of Majority Pet'rs' Mot. to Designate their Counsel as Sole Lead Counsel and in Opp'n to A&B Group's Cross-Mot. for Lead (Dkt. 31) ("RKS Group Reply Br.") 28-29.

[50] A&B Group Opening Br. 6.

[51] *E.g.*, *In re Plains Res. Inc.*, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005) (explaining that contingent fee arrangements are "consistent with the public policy of Delaware" because they "reward . . . risk-taking in the interests of shareholders"); *In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 726 (Del. Ch. 2023) (discussing the fairness intrinsic to contingency fee structures), *aff'd*, 326 A.3d 686 (Del. 2024).

misaligned interests not only between counsel and stockholders, but also among the stockholders themselves.

At a high level, the RKS Group's fees are 20% to 25% percent of any recovery above the merger consideration—including statutory interest.[52] Silver Lake has declined to prepay dissenting stockholders' merger consideration "until there is a full resolution with respect to [these] appraisal claims."[53] So if I were to find that the $27.50 deal price reflected fair value, interest could exceed $800 million and the RKS Group's fees from the entire appraisal pool could exceed $200 million.[54] In that scenario, the RKS Group's fees would be many multiples higher than what A&B

---

[52] RKS Group Reply Br. 33; *see* 8 *Del. C.* § 262(h) (providing for statutory interest compounded quarterly and accruing "at 5% over the Federal Reserve discount rate" for the period between the merger's effective date and payment of a judgment); *see also* Transmittal Aff. of April M. Ferraro, Esq. in Supp. of A&B Grp.'s Br. in Opp'n to RKS Grp.'s Mot. for Designation as Sole Lead Counsel and in Supp. of Cross-Mot. for an Alternative Leadership Structure ("Ferraro Aff.") Ex. 5 ¶ 6; Ferraro Aff. Ex. 6 ¶ 6(c); Ferraro Aff. Ex. 7 ¶ 8; Ferraro Aff. Ex. 8 ¶ 6.

[53] *Silver Lake to Close Endeavor Transaction on March 24th at $27.50*, Business Wire (Mar. 3, 2025), https://www.businesswire.com/news/home/20250303663576/en/Silver-Lake-To-Close-Endeavor-Transaction-On-March-24th-At-%2427.50; *see also* A&B Group Opening Br. 14; RKS Group Opening Br. 9; 8 *Del. C.* § 262(h) (permitting a respondent to prepay some or all merger consideration to cut off the accrual of interest).

[54] Assuming no premium to the current merger consideration and that the litigation ends in two years, A&B calculates total interest of $847,831,602.00, leading to fees for the RKS Group of $169,566,320.40 million (20%) to $211,957,900.50 million (25%). A&B Group Opening Br. 39; *see* 8 *Del. C.* § 262(h). These figures do not reflect any reduction for RKS's waiver of fees for clients with shares over 10 million.

would receive under an hourly model.[55]  Equity will not countenance windfalls to counsel from Pyrrhic victories.[56]

Bespoke features of the RKS Group's fee structure provide further cause for concern.  RKS effectively divided stockholders into tiers.  First, it offered an "early mover" discount—lowering its 25% contingency fee to 20%—for clients who committed to engage it by a fixed date.[57]  Second, it agreed to cap fees for clients with large stakes, waiving fees on shares over 10 million to give these clients an effective rate of less than 20%.[58]  Everyone else must pay 25% on all shares.

---

[55] *See* A&B Group Opening Br. 40 (calculating fees as high as $50 million).  Of course, if the court sets fair value below the deal price, the RKS Group would receive no fees while the A&B Group would recover its hourly fees.  Two of A&B's clients have offered to reimburse those who engaged A&B after May 23 for their pro rata portion of A&B's fees in excess of the dissenters' upside to mitigate the downside scenario associated with an hourly model.  *Id.* at 51-52.

[56] *See Dell*, 326 A.3d at 702 (noting the "policy concern of preventing windfalls to counsel").

[57] RKS Group Reply Br. 32-33 & n.11; *see also* A&B Group Opening Br. 29 n.19.

[58] *See* RKS Group Reply Br. 6.  To explain how RKS's waiver of fees on shares over 10 million results in a lower total effective rate, a stylized example is helpful.  Imagine a hypothetical stockholder with 15 million shares and who negotiated a 20% contingency rate with RKS.  Assume that the court determined a fair value of $30 per share (compared to the $27.50 merger price)—a $2.50 per share recovery.  (For simplicity, this hypothetical excludes the effect of interest.)  The stockholder would recover $37.5 million ($2.50 x 15 million shares).  But rather than pay counsel 20% of this amount ($7.5 million), it would only pay 20% of the amount recovered on its first 10 million shares ($5 million; $2.50 x 10 million shares x 20%).  An effective contingency rate of 13.33% ($5,000,000 / $37,500,000) would result.  The discount increases with more shares.  Holding all else constant under this example, if the hypothetical stockholder had 25 million shares instead

This structure hazards inequitable treatment of dissenting stockholders.[59] It shifts a disproportionate amount of fees (on a per-share basis) from large holders to smaller ones, and from "early" movers to those who hired RKS later—or not at all. The waiver on fees above 10 million shares might also contravene "most favored nation" clauses that RKS negotiated with several clients in the 20% tier.[60] A&B's structure, by contrast, allocates its hourly fees pro rata according to ownership, ensuring equal treatment among dissenters.[61]

## III. CONCLUSION

The relevant Rule 23 factors favor denying the RKS Group's motion and granting the A&B Group's cross-motion. The A&B Group represents clients with a relatively larger stake and has a more equitable fee structure that avoids conflicts

---

of 15 million, the effective rate would be just 8% ($5,000,000 payment / $62,500,000 recovery).

[59] *Cf. In the Matter of the Appraisal of Shell Oil Co.*, 1986 WL 2635, at *1 (Del. Ch. Feb. 21, 1986) ("[T]he named plaintiffs have a fiduciary duty under the appraisal statute to those dissenting stockholders who are entitled to an appraisal but have not filed a civil action.").

[60] *See* A&B Group Opening Br. 13; *see, e.g.*, Ferraro Aff. Ex. 8 ¶¶ 7-8; *id.* at Ex. A § 2.1.e; Ferraro Aff. Ex. 10 at Ex. A § 2.1.e.

[61] *Cf.* 8 *Del. C.* § 262(j); *Rouse*, 2016 WL 7188104, at *5 ("Section 262(j) incorporates basic common-fund principles with respect to the allocation of counsel fees among the appraisal class at the conclusion of the litigation.").

among dissenting stockholders.  A&B is appointed as sole lead counsel, with RCT

as additional counsel.

Sincerely yours,

/s/ *Lori W. Will*

Lori W. Will
Vice Chancellor

cc:    Raymond DiCamillo, Esquire
       John Hendershot, Esquire
       Robert Burns, Esquire
       John O'Toole, Esquire
       Marcus E. Montejo, Esquire
       Kevin H. Davenport, Esquire
       John G. Day, Esquire
       Seth T. Ford, Esquire